UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>     vs.<br><br>GUSTAVO MENDOZA - PULIDO,<br><br>             Defendant. | Case No. CR 08-00513 RMT<br><br>ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE |

This matter has come before the court on the motion by Defendant Gustavo Mendoza - Pulido ("Defendant") to suppress evidence. A hearing on Defendant's motion was held on September 29, 2008, at which time this court orally granted the motion. The court issues this written order to ensure the record reflects the basis on which Defendant's motion to suppress evidence was granted.

On April 12, 2008, Defendant Gustavo Mendoza - Pulido was charged with knowingly and intentionally possessing with the intent to distribute, one kilogram or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841 (a) (1) and (b) (1) (A). On August 20, 2008, Defendant filed a motion to suppress all evidence obtained when federal agents stopped the vehicle driven by Mr. Mendoza - Pulido on April 12, 2008. Defendant's Motion to Suppress Evidence ("Def's Mot.") at 6. According to Defendant, the evidence should be suppressed because the

federal agents lacked reasonable suspicion to stop Mr. Mendoza - Pulido's vehicle, thus violating Defendant's Fourth Amendment rights. *Id.* at 8.

On September 29, 2008, the court conducted an evidentiary hearing on Defendant's Motion. Border Patrol Agent Miguel Perez ("Agent Perez"), with the United States Customs and Border Protection ("USCBP") and Senior Border Patrol Agent Luis Lopez ("Agent Lopez"), also with USCBP, testified during the evidentiary hearing.

The court, having considered the pleadings, record, testimony during the evidentiary hearing, and other papers filed in this matter, finds as follows:

On Saturday, April 12, 2008, at approximately 9:30 a.m., Agent Perez noticed Defendant's blue Ford Expedition while patrolling Interstate 15 ("1-15") in the northbound direction. Declaration of Agent Perez ("Perez Decl.") ¶¶ 4, 6, attached to Gov't Opp'n. At the time, Agent Perez was driving an unmarked Chevrolet Camaro. *Id.* ¶ 4. Agent Perez testified that as Defendant passed by him, driving approximately 75 miles per hour, he noticed that Defendant was driving alone, seemed calm and relaxed and that Defendant's vehicle had Baja California, Mexico, license plates. In his declaration, Agent Perez remarked that as Defendant passed by him, Defendant did not look at Agent Perez. Perez Decl. at ¶ 10.

According to Agent Perez, when Defendant noticed the marked Border Patrol car driven by Agent Lopez on the road ahead, Defendant slowed down his vehicle and changed lanes, from the second lane from the left, to the third lane, thus increasing the distance between the Defendant and Agent Lopez' car, then on the first and fastest lane.

Agent Perez testified that when Defendant changed lanes, Defendant looked "shocked" in reaction to seeing Agent Lopez' marked vehicle. Asked about his location in relation to the Defendant, Agent Perez first testified that he was driving on the fourth and slowest lane and about thirty-two to forty-eight feet away from Defendant's vehicle, and that he could see Defendant's eyes and facial expressions through the Ford

Expeditions' rear window and through Agent Perez' front windshield.[1] After defense counsel showed Agent Perez photos of Defendant's Expedition, which showed that both the rear window as well as the side rear window were tinted, Defendant's Exhibit C and D, Agent Perez vacillated in his testimony.[2] Agent Perez first said he could see Defendant's "shocked" expression through the tinted windows, and then, that he had seen Defendant's facial expressions through the side window because, at one time, Defendant and Agent Perez were driving side by side. Upon further questioning, Agent Perez acknowledged that at no point before had Agent Perez mentioned he had driven side by side with the Defendant.

Agent Perez then radioed Agent Lopez to tell him that Defendant had slowed down and changed lanes as Defendant approached Agent Lopez' marked vehicle.

According to Agent Lopez, upon receiving Agent Perez' call, he noticed that Defendant's car was two lanes to his right and approaching Agent Lopez, whose vehicle was then in the fast, Number 1 lane and going about 70 to 75 miles per hour. Agent Lopez testified that he then slowed down his own vehicle to about 40 to 45 miles per hour, still in the fast lane, until Agent Lopez was driving beside Defendant. Agent Lopez testified that as they drove side by side for approximately ten seconds, Agent Lopez was able to intensely observe Defendant through Defendant's driver's side window. Agent Lopez testified that while driving side by side, he noticed that Defendant looked so tense and was grabbing the steering wheel so tightly with both hands, that, to Agent Lopez, it seemed Defendant's body was being pushed back into the seat. According to Agent Lopez, Defendant never looked at Agent Lopez as

---

[1] In his declaration, Agent Perez stated, in pertinent part, that "[a]s [Defendant] changed lanes, defendant looked back and to the side, over both shoulders. He looked shocked. His eyes were opened wide. I was able to see this because I was still in the Number 4 Lane, not far behind him." Perez Decl. at ¶ 13.

[2] The photographs were later admitted into evidence.

3

1  Defendant drove past him.

2  Agent Lopez testified that after Defendant drove past him, Agent Lopez changed
3  from the first and fastest lane to the third lane, behind Defendant's vehicle.  As Agent
4  Lopez remained behind Defendant's vehicle, Defendant changed to the second lane,
5  increasing his vehicle's speed.  According to Agent Lopez, because he interpreted
6  Defendant's move as an attempt to escape, Agent Lopez activated his lights and stopped
7  Defendant.

8  Defendant seeks to exclude all evidence obtained from Defendant's stop on April
9  12, 2008.  Def's Mot. at 1-2.  Defendant argues that because the federal agents had no
10  reasonable suspicion to stop him, the stop was illegal, making all evidence obtained as a
11  result of the stop inadmissible at trial as a result of a violation of Defendant's Fourth
12  Amendment rights.  Def's Mot. at 8.

13  A law enforcement officer's investigatory stop of a vehicle implicates a
14  defendant's Forth Amendment rights "because stopping an automobile and detaining its
15  occupants constitute a seizure ... even though the purpose of the stop is limited and the
16  resulting detention quite brief." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th
17  Cir. 2006) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  Courts have found
18  that because investigatory traffic stops are akin to the on-the-street encounters addressed
19  in *Terry v. Ohio*, 392 U.S. 1 (1968), the same objective standard as in *Terry* applies to
20  investigatory traffic stops. *Choudhry*, 461 F.3d at 1100 (citing *United States v.*
21  *Lopez-Soto*, 205 F.3d 1101, 1104 -1105 (9th Cir. 2000) ("We join those circuits and
22  reaffirm that the Fourth Amendment requires only reasonable suspicion in the context of
23  investigative traffic stops."))  Thus, a law enforcement officer may conduct an
24  investigatory traffic stop if the officer has reasonable suspicion "that a particular person
25  has committed, is committing, or is about to commit a crime." *Lopez-Soto*, 205 F.3d
26  at1104 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

27  Reasonable suspicion exists when "an officer is aware of specific, articulable
28  facts which, when considered with objective and reasonable inferences, form a basis for

*particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc).  Particularized suspicion encompasses two elements. "First, the assessment must be based upon the totality of the circumstances.  Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped has* committed or is about to commit a crime." *Id*. (emphasis in original).

Although the reasonable suspicion standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," *United States v. Arvizu*, 534 U.S. 266 (2002), "experience may not be used to give the officers unbridled discretion in making a stop." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006).

> Accordingly, to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law abiding population.  Seemingly innocuous behavior does not justify an investigatory stop unless it is combined with other circumstances that tend cumulatively to indicate criminal activity.

*Id*. (internal citations omitted.)

In Defendant's case, the Government argues the officers had reasonable suspicion to stop Defendant because, based on their experience as USCBP agents, they found that a person, driving a Ford Expedition, alone, on a highway known as a route heavily used to smuggle drugs and illegal aliens, at a time of the day close to USCBP's shift change, near the closed Temecula Checkpoint - about 70 to 75 miles from the border between the United States and Mexico -  in combination with Defendant's change in behavior, was suspicious.  Gov't Opp'n at 19-20.

The court finds that the Agents' attempts to characterize Defendant's behavior as suspicious are not credible.  The inference the Agents drew from Defendant's innocuous behavior, in combination with the other circumstances surrounding Defendant's stop, do not support the Agents' testimony that they had reasonable suspicion that Defendant had committed or was about to commit a crime.

Agent Perez testified that he thought it was suspicious that Defendant, seeing a marked law enforcement vehicle ahead, decreased his vehicle's speed from 70-75 miles per hour to 60 to 65 miles per hour, a speed closer to the legal speed limit. According to Agent Perez, this behavior was suspicious because local drivers know USCBP agents "have no authority to issue traffic citations." Perez Decl. ¶11. Both Agent Perez and Agent Lopez testified they noted that Defendant did not look at either of them as Defendant passed by them. According to Agent Lopez, this behavior was suspicious because locals not only do not slow down when they see a marked USCBP vehicle in the vicinity of the I-15 Corridor, they "commonly go around" the USCBP vehicle, and "regularly acknowledge [the USCBP Agent] as they drive by, often by looking [their] way." Lopez Decl. ¶7. It is odd that the Agents were suspicious of Defendant for not behaving as "a local" when the Agents themselves found it notable that Defendant's car had Baja California, Mexico, license plates. The most reasonable conclusion from Defendant's behavior, given the knowledge the Agents impute to locals, was that, in fact, Defendant was not a local. Under the Agents' characterizations, all non-locals traveling through an international route known for drug smuggling who do not behave as locals do would be suspicious.

Furthermore, it is certainly reasonable for a driver traveling faster than the legal speed limit to reduce his speed upon spotting a marked law enforcement vehicle for no other reason that to bring his vehicle's speed to within the legal speed limit. Both Agents rely "solely on generalizations that, if accepted, would cast suspicion on large segments of the law abiding population." *Manzo-Jurado*, 457 F.3d at 935.

The Government points to additional circumstances, arguing that, combined with Defendant's slowing down at the sight of a marked law enforcement vehicle and not acknowledging the law enforcement agent as he drove by, cumulatively tend to indicate criminal activity. The additional circumstances upon which the Government relies, however, are also not convincing.

Agent Lopez testified that Defendant's nervousness when Agent Lopez was

driving side by side with Defendant was suspicious. However, during his testimony, Agent Lopez agreed that he, himself, would have become nervous had he seen a marked law enforcement vehicle abruptly reduce his speed, from 70 or 75 miles per hour to 40 or 45 miles per hour while still in the fast lane on an interstate highway, and had the officer in that marked law enforcement vehicle stared at him for ten seconds.

Although the Agents testified that Defendant, driving by himself on a Saturday morning, was suspicious because vehicles on the road on a Saturday morning usually transport families, they also testified that a person driving a large vehicle with a group of people may be suspected of smuggling aliens.

According to the Agents, one of the main factors they rely upon when determining reasonable suspicion to stop an individual is the individual's changes in behavior. Thus, the Agents point to the change in Defendant's facial expressions when Defendant noticed the marked vehicle. The court finds that the Agents' observations of Defendant's demeanor are not credible. While Agent Perez testified he was able to see Defendant's facial expression from a distance while the Agent himself was in his vehicle, Agent Perez described his vantage point very differently when confronted with photos of the vehicle showing the back windows were tinted. When the reasonable suspicion of the stop depends on law enforcement observations of a defendant's demeanor, an officer's ability to indeed observe the demeanor in question is crucial.

Finally, while the Agents try to characterize Defendant's changing lanes and increasing his speed as evasive maneuvers, changing lanes and moving away from a law enforcement vehicle fall far short of the evasive behavior that has supported reasonable suspicion in other cases. *Montero-Camargo*, 208 F.3d at (drivers making U-turns when approaching checkpoint a significant factor in finding reasonable suspicion); *United State v. Rodriguez-Sanchez*, 23 F.3d 1488, 1493 (9th Cir. 1994) (sudden and abrupt exit from highway onto an exit ramp obvious attempt to evade officers that can support reasonable suspicion) *overruled on other grounds* by *Montero-Camargo,* 208 F.3d at 1134 n.22. Moreover, without more, changing to a faster lane and increasing a vehicle's

7

speed once in the faster lane cannot be construed as an evasive maneuver.

Thus, the court finds there was no reasonable suspicion to justify stopping Defendant's vehicle.

Accordingly,

IT IS ORDERED that Defendant's Motion to suppress is HEREBY GRANTED, thus all evidence obtained as a result of the investigatory stop of Defendant's vehicle on April 12, 2008 is SUPPRESSED.

Dated: October 9, 2008.

ROBERT M. TAKASUGI
United States District Sr. Judge